IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JIMMY SAIN,

    Plaintiff,

v.  No. 07-cv-1187

COMMISSIONER DAVE MITCHELL,
individually, (FORMER)
COMMISSIONER GERALD NICELY,
individually, and COLONEL MIKE
WALKER

    Defendants.

___

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
___

The Plaintiff, Jimmy Sain, initially filed this civil action in the Hardeman County Circuit Court against the State of Tennessee, alleging claims for promissory estoppel and negligent misrepresentation. The Plaintiff subsequently amended his complaint to assert liability under 42 U.S.C. § 1983, and the State then removed the case to federal court pursuant to 28 U.S.C. §§ 1331, 1141, 1446. After several additional amendments to the complaint, Sain's remaining claims now involve violations of the First and Fourteenth Amendments by Defendants, Commissioner Dave Mitchell, who is the current head of the Tennessee Department of Safety, Commissioner Gerald Nicely, who is Mitchell's predecessor, and Colonel Mike Walker, who is head of the Tennessee Highway Patrol. The Defendants have filed a motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, asserting qualified immunity and an inability of Plaintiff to assert a violation of § 1983. Upon consideration of the parties' respective positions, the Court GRANTS

the Defendants' motion.

FACTUAL BACKGROUND

Sain worked as a highway patrolman for the Tennessee Department of Safety ("TDS"). (Docket Entry ("D.E.") No. 35, Def.'s St. of Fact, at ¶ 13.) After deciding to run for Mayor of Hardeman County, Tennessee, Sain resigned from this position in order to comply with the Hatch Act.[1] (D.E. 40, Pl.'s Response, at 2.) Upon leaving, he met with his supervisor and the Human Resources Manager for the TDS to inquire about his eligibility for being rehired after the election, and he was purportedly informed that he would be reinstated to active duty if his bid was unsuccessful. (D.E. 31, Amend. Complaint, at ¶ 7.)

In 2005, the topic of political favoritism within the TDS attracted significant media attention. (D.E. 40, Walker Depo., at 15-16.) For example, Brad Schrade, a staff writer for The Tennessean, wrote an article about the correlation between political support by members of the Tennessee Highway Patrol for current Tennessee Governor Phil Bredesen and promotions awarded to those troopers. (D.E. 40, Newspaper Article, at 1.) He reported on the TDS's "habit of making supervisors out of troopers who donated to the governor's campaign."[2] (Id. at 2.)

When Colonel Walker was appointed to the TDS, Governor Bredesen instructed him to "fix it" in regard to "politics" within the department. (D.E. 40, Walker Depo., at 44.) During Walker's

---

[1]The relevant portion of this statute provides that "[a] State or local officer or employee may not . . . be a candidate for elective office." 5 U.S.C. § 1502(a)(3).

[2]According to Schrade, two-thirds of the state troopers promoted during Governor Bredesen's term had donated money to his campaign. He also noted that this problem was not unique to Bredesen's administration, but part of a long history of political favoritism within the highway patrol. (D.E. 40, Newspaper Article.)

tenure, the TDS adopted a policy whereby troopers who resigned to run for office in a partisan election would not be rehired, regardless of whether they won or lost.[3]  (Id. at 15.)  This general policy was not directed at any particular individual; rather, it applied indiscriminately throughout the department in an attempt to eliminate the appearance of political influence.  (Id. at 17-18.)  Walker stated that, since this policy was adopted, no trooper who resigned to run for elected office had been permitted to return to his or her former position.  (Id. at 18.)

Sain was unsuccessful in his bid to become Hardeman County mayor.  (D.E. 40, Pl.'s Response, at 2.)  When he attempted to regain his former job as a highway patrolman, Plaintiff was refused based upon the new policy implemented by Walker.  Claiming a violation of his right to seek political office under the First and Fourteenth Amendments, Sain now seeks reinstatement and an award of money damages for lost earnings, front pay, and compensatory damages.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that

> judgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the Court views the evidence in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

---

[3]This policy was adopted by Commissioner Nicely and continued under Commissioner Mitchell.  (D.E. 40, Walker Depo., at 46.)

587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). When the motion is supported by documentary proof, such as depositions and affidavits, the nonmoving party may not rest on the pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324; see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir.1998). It is insufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [an] asserted cause[] of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

ANALYSIS

I.      Absolute Immunity

The United States Supreme Court has held that a suit against a state officer in his official capacity is tantamount to a suit against a state. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Absent a clear abrogation of immunity by congressional

4

action or an express state waiver of that immunity, the Eleventh Amendment prohibits suits against states or state officials in federal court. See, e.g., Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); Pennhurst State Schl. & Hosp. v. Halderman, 465 U.S. 89, 98-100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984); Quern v. Jordan, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979). While 42 U.S.C. § 1983 imposes liability on any "person" who, under the color of state law, deprives another of a constitutional right, this statute does not apply to state officials acting in their official capacity. Will, 491 U.S. at 71. Thus, Sain's claims for monetary damages against the Defendants in their official capacities must be dismissed.

While the Plaintiff's complaint does not explicitly request an injunction, it does refer to reinstatement and equitable relief. Under the liberal pleading standards, the Court finds this sufficient to raise a request for an injunction. See, e.g., Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (stating that a complaint should "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"). The Supreme Court has held that the Eleventh Amendment does not preclude suits against state officials, even in an official capacity, for injunctive relief. Ex Parte Young, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908). As such, Sain may still seek an injunction against the Defendants in their official capacities.

II.     Qualified Immunity

Executive officials enjoy qualified immunity in conducting their official duties. See Buckley v. Fitzsimmons, 509 U.S. 259, 273, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993) (noting that "qualified immunity 'represents the norm' for executive officers") (quoting Malley v. Briggs, 475 U.S. 335, 340, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). This means that "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability

5

for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)); see also Buckner v. Kilgore, 36 F.3d 536, 539 (6th Cir. 1994). The objective behind qualified immunity is to "balance[] two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

The Supreme Court has articulated a two-part test to determine whether qualified immunity applies.[4] Saucier v. Katz, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); see also Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 172 (6th Cir. 2004). The two issues in a qualified immunity inquiry are as follows: (1) whether, when taken in the light most favorable to the party asserting the injury, the facts alleged show the officials' conduct violated a constitutional right; and (2) whether the right was clearly established. Saucier, 533 U.S. at 200-01. As to the "clearly established" issue, a court must decide "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted, . . . without regard to [the official's] underlying intent or motivations." Solomon, 389 F.3d at 173 (citations and emphasis omitted). Put another way, in order to support a finding that an official is entitled to qualified immunity, the Court must conclude that the official's actions were objectively reasonable. Id. at 174. Qualified immunity may bar a lawsuit when the official "makes a decision that, even if constitutionally deficient, reasonably

---

[4]Overruling a previous requirement that these steps be addressed in sequential order, the Supreme Court recently deferred the decision as to which step to address first to the trial court. Pearson, 129 S. Ct. at 817.

misapprehends the law governing the circumstances [that the official] confronted." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004); see also Dunigan v. Noble, 390 F.3d 486, 491 (6th Cir. 2004). Whether the official's misunderstanding of the law was reasonable, however, directly depends upon whether the constitutional right at issue was "clearly established." Saucier, 533 U.S. at 201.

Sain asserts claims against state officials under § 1983, which imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the [United States] Constitution or laws." In order to prevail on such a claim, a plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." Humes v. Gilless, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." Chapman v. City of Detroit, 808 F.2d 459, 465 (6th Cir. 1986). In this case, the Plaintiff argues that he had been retaliated against for exercising his right under the First and Fourteenth Amendments to run as a candidate for public office. In determining whether the Defendants are entitled to qualified immunity, the Court will first address the issue of whether constitutional protections for Sain's activities were "clearly established" under either of these provisions. See Pearson, 129 S. Ct. at 818 (holding that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion

in deciding which of the two prongs of the qualified immunity analysis should be addressed first").

The Supreme Court has never held that the Constitution protects a fundamental right to candidacy for public office. See Bullock v. Carter, 405 U.S. 134, 142-43, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972) (noting that it has never recognized an individual candidate's right to run for office); see also Clements v. Fashing, 457 U.S. 957, 73 L. Ed. 2d 508, 102 S. Ct. 2836 (1982) (same). The fundamental rights to freedom of speech, see, e.g., Grosjean v. Am. Press Co., 297 U.S. 233, 243, 80 L. Ed. 660, 56 S. Ct. 444 (1936), and freedom to associate, see, e.g., Gibson v. Fla. Legislative Investigative Comm., 372 U.S. 539, 544, 9 L. Ed. 2d 929, 83 S. Ct. 889 (1963), are well-established in First Amendment jurisprudence, but the Supreme Court has not specifically indicated that either of these rights protect the specific act of pursuing elected office.

In Carver v. Dennis, 104 F.3d 847, 849 (6th Cir. 1997), the Sixth Circuit considered whether the First Amendment was violated in a situation where a deputy clerk was fired because she ran in an election against her boss for the position of county clerk.[5] The court noted that plaintiff had not been "singled . . . out for her political beliefs or her political affiliations, and indeed, the parties have stipulated that the election was non-partisan and that political affiliation was irrelevant." Id. at 852. Rather, the sole reason for Carver's termination was that she had sought election to her supervisor's

---

[5]In Carver, the district court had granted the defendant's motion for summary judgment after applying the balancing test from Pickering v. Board of Education, 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968) and determining that the employer's interest outweighed the plaintiff's rights. Carver v. Dennis, 886 F. Supp. 636, 640 (M.D. Tenn. 1995). Under Pickering, a public employee must satisfy a two-part test in order to proceed with a claim for violation of the First Amendment. Adair v. Charter County of Wayne, 452 F.3d 482, 492 (6th Cir. 2006). First, the speech must have touched on matters of public concern. Strouss v. Mich. Dep't of Corr., 250 F.3d 336, 345-46 (6th Cir. 2001). Second, the interest of the employee "in commenting upon matters of public concern" must outweigh the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (quoting Pickering, 391 U.S. at 568).

position.  Id. at 850.  The Sixth Circuit noted that there had been no "dismissal based on politics at all, except to the extent that running for public office is a political exercise in its broad sense."  Id.  It then held that the First Amendment did not protect the plaintiff's conduct because the

> record contain[ed] no evidence that the basis for [the plaintiff's] discharge was her exercise of her right to speak out on matters of public concern.  Indeed, there is no evidence that [the plaintiff] either held or voiced any opinions on anything.  The basis for her discharge was solely the fact that she was trying to take the job of her employer.

Id. at 852.

Like in Carver, the record in this case does not establish that Sain was denied employment because of any particular expressions regarding matters of public concern he had made or any affiliations he had held.  The Plaintiff attempts to distinguish Carver from his case by highlighting the fact that Carver sought to be elected to her boss's position.  Unlike in Carver, Sain was not a "viper in the nest" in the sense that he did not attempt to replace anyone within his own department and was fired solely for the fact that he ran for public office, irrespective of who held the office he was seeking.  Id. at 853.  The Carver court did make note of the fact that the plaintiff's political opponent also had been her supervisor.  In particular, the court stated:

> While Dennis did not expressly label her reason for discharging Carver as insubordination, Carver's declaration of candidacy against Dennis under the circumstances of this case clearly was insubordination.  While there is no support in the record for a claim that Carver was discharged for patronage or political reasons, or that she was discharged for speaking out on issues of public concern, the record permits no escape from the fact that Carver was fired for announcing her intention to take her boss's office.

Id. at 853 (citation omitted).  Furthermore, this was not the only circumstance that the Carver court considered in rejecting the plaintiff's argument.  It also noted that her termination was neutral in terms of the First Amendment because

9

> Carver does not allege that Dennis singled her out for her political beliefs or her political affiliations, and indeed, the parties have stipulated that the election was non-partisan and that political affiliation was irrelevant. Neither does she allege that Dennis would have allowed another employee, had there been one in the office, to run while continuing on the job.

Id. at 852 (citing Bart v. Telford, 677 F.2d 622, 624 (7th Cir. 1982)). Upon a review of Carver's holding, reasonable minds could differ as to which of the two following reasons prompted the Sixth Circuit to hold in favor of the defendant: (1) plaintiff's insubordination in seeking to oust her supervisor established a neutral "good cause" justification for her termination; or (2) because plaintiff's candidacy was neither protected expression nor affiliation, she failed to present any protected activity that had motivated her termination. Stated more succinctly, it is not apparent whether the holding of Carver applies to all candidacies or just challenges against supervisors.[6]

For this prong of the qualified immunity analysis, the Court need not determine how broadly the Carver opinion should be interpreted. It is sufficient to note that the status of a right to candidacy is unclear in the context of the facts of this case.[7] As the Sixth Circuit noted in regard to a First and Fourteenth Amendment challenge to a state election board's invalidation of a candidate's nominating signatures, "whether an individual has a constitutionally protected interest in becoming

---

[6]The Carver court found that the plaintiff failed to present evidence establishing that her termination had been motivated by her political beliefs because the record only showed that "Dennis fired her for her rival candidacy." Carver, 104 F.3d at 850 (emphasis in original). The fact that the Sixth Circuit emphasized the word "candidacy" supports the notion that it intended the holding to apply to all types of candidacies, so long as particular political expressions or affiliations were not an issue. If that court had emphasized the word "rival" instead, that might have supported the Plaintiff's argument that the holding in Carver applies only to employees fired for running against their bosses.

[7]The Plaintiff also asserts that he was "profiled as one likely to engage in First Amendment activity . . . because he ran for office in the past." (D.E. 40, Pl.'s Response, at 17.) He has cited to no case law to support his "First Amendment profiling" theory, and the Court does not believe that such a claim is available.

10

a candidate for public office is <u>not clear</u>." <u>Miller v. Lorain County Bd. of Elections</u>, 141 F.3d 252, 260 (6th Cir. 1998) (emphasis added). The <u>Miller</u> court further lamented that it is difficult to define "the contours of the right of candidacy" but predicted that, "[g]iven the integral relationship between candidacy and voters' rights under the First Amendment, candidacy <u>may</u> involve some level of a protected property or liberty interest." <u>Id.</u> at 260 n.8 (emphasis added) (citing <u>Duke v. Massey</u>, 87 F.3d 1226, 1232 (11th Cir. 1996)). The <u>Miller</u> court, however, provided no guidance as to the extent of protection that the First Amendment may impart in these situations. The plaintiff in <u>Miller</u> also made an argument under the Equal Protection Clause of the Fourteenth Amendment. Given the similarities between equal protection and due process challenges, this Court believes that the <u>Miller</u> court's comment about a lack of clarity also holds true for Sain's substantive due process challenge. <u>See</u> <u>Bolling v. Sharpe</u>, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954) (stating that both equal protection and due process stem from the "American ideal of fairness" and "are not mutually exclusive"); <u>see also</u> <u>United States v. Miller</u>, __ F. Supp. 2d __, No. 08-cr-10097, 2009 WL 499111, 2009 U.S. Dist. LEXIS 15080, at *14-15 n.7 (W.D. Tenn Feb. 26, 2009) (comparing due process and equal protection).

Due to the <u>Miller</u> court's recognition that a constitutional right to candidacy is unsettled in this circuit, as well as the ambiguous holding of <u>Carver</u> when applied to the facts of this case, this Court cannot find that reasonable officials in the Defendants' positions would have known that a politically-neutral policy–barring all former candidates for elected office from returning to the highway patrol–violated either the First or Fourteenth Amendments.[8] <u>Solomon</u>, 389 F.3d at 173.

---

[8]The Plaintiff argues that <u>Becton v. Thomas</u>, 48 F. Supp. 2d 747 (W.D. Tenn. 1999) clearly establishes that a right to run for public office is protected under the Fourteenth Amendment. However, that case did not deal with the issue of qualified immunity or whether a

11

Even if this Court ultimately was to find that the Defendants' actions were illegal, the officials' misunderstandings about the current state of the law on this issue would be reasonable. Brosseau, 543 U.S. at 198. Thus, they are entitled to qualified immunity from the Plaintiff's § 1983 claim for monetary damages.

  III.  Injunctive Relief

While qualified immunity shields the Defendants in their individual capacities from liability for monetary damages, the Plaintiff may still receive injunctive relief. See, e.g., Wood v. Strickland, 420 U.S. 308, 314 n.6, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975); Gunasekera v. Irwin, 551 F.3d 461, 471 (6th Cir. 2009) (stating that "qualified immunity does not bar injunctive relief"). Due to the remaining issue of whether Sain is entitled to reinstatement, the Court considers whether his First and Fourteenth Amendment rights have been infringed, regardless of whether the law in this area is settled.[9]

As noted supra, depending upon how broadly the Carver opinion is interpreted, it might be fatal to the Plaintiff's First Amendment argument. Sain's case can be factually distinguished from Carver because he was not a "viper in the nest," but it is unclear whether this distinction has legal significance. Subsequent commentary provides some guidance. In Murphy v. Cockrell, 505 F.3d 446, 450 (6th Cir. 2007), the author of the opinion, Judge Boyce Martin, interpreted Sixth Circuit precedent to hold that "there is no protected right to candidacy under the First Amendment, and a

---

right to candidacy is sufficiently clear. Also, the Becton opinion quoted from Miller and noted the lack of clarity regarding this point of law. Id. at 757.

 [9]This inquiry will resemble the other prong of the qualified immunity analysis. See Saucier, 533 U.S. at 200-01 (explaining that the other prong is whether, when taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right).

public employee may be terminated because of the fact of that employee's candidacy." While he noted that this issue in Carver was limited to the "question of whether the First Amendment recognized a government employee's ability to run for office as a fundamental right," he did not allude to the "viper in the nest" aspect as being an integral part of the holding. Id. Additionally, Judge Martin wrote that other district courts have since concluded that dismissal because of candidacy alone does not violate the First Amendment in the absence of a showing that the plaintiff's expressions or affiliations motivated her termination. Id. (citing Greenwell v. Parsley, 2007 U.S. Dist. LEXIS 34012, 2007 WL 1406955, at *1 (W.D. Ky. 2007); Cupit v. Charter Twp. of Mundy, 2006 U.S. Dist. LEXIS 50963, 2006 WL 2071159, at *2-3 (E.D. Mich. 2006)). This Court concurs with this interpretation of Carver. While the Plaintiff may disagree with the legal basis of the Sixth Circuit's precedent,[10] the present rule in this circuit is that, in order for a plaintiff to show a First Amendment violation for retaliation in response to his candidacy, he must show that the employer's retaliatory actions were motivated by particular "political beliefs, expressions, affiliation[s], partisan political activit[ies], or expression[s] of opinion." Id. Because Sain has not presented evidence establishing this motivation, the First Amendment does not provide him grounds for the issuance of an injunction.

---

[10] One Sixth Circuit panel has even suggested that the arguments for overruling Carver are strong. See Myers v. Dean, 216 Fed. App'x 552, 554-55 (6th Cir. 2007) (noting that, under the current law, a plaintiff "is protected from retaliation for supporting any candidate other than herself"). In a concurring opinion, Judge Martin has opined that Carver is based on weak precedential support and suggested that the Sixth Circuit reconsider this decision. Greenwell v. Parsley, 541 F.3d 401, 405 (6th Cir. 2009) (Martin, J., concurring). Additionally, cases from other circuits seem to contradict the holding of Carver. See, e.g., Finkelstein v. Bergna, 924 F.2d 1449, 1453 (9th Cir. 1991); Stiles v. Blunt, 912 F.2d 260, 265 (8th Cir. 1990); Flinn v. Gordon, 775 F.2d 1551, 1554 (11th Cir. 1985); Washington v. Finlay, 664 F.2d 913, 927-28 (4th Cir. 1981); Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir. 1977); Magill v. Lynch, 560 F.2d 22, 27 (1st Cir. 1977) (as cited in Murphy, 505 F.3d at 450 n.1).

Finally, the Court considers the Plaintiff's argument that the Defendants infringed upon his interest in running for public office in violation of the Due Process Clause. He primarily relies on the case of Becton v. Thomas, 48 F. Supp. 2d 747 (W.D. Tenn. 1999), in which District Judge Bernice Donald held that the "right to run for public office is constitutionally protected as a liberty interest under the Fourteenth Amendment's Due Process Clause." She further wrote that, though it is not fundamental, "a state cannot deny or infringe [a person's liberty interest in a running for public office] unless it can offer a reasonable justification or rational basis for doing so." Id. at 757-58. This Court essentially agrees with Judge Donald's determination that rational-basis scrutiny applies to restrictions on a person's liberty interest in running for office. Under the rational basis test, government action will not be held unconstitutional unless no conceivable, legitimate basis rationally supports it. Trihealth, Inc. v. Bd. of Comm'rs, 430 F.3d 783, 790 (6th Cir. 2005). Such a legitimate reason "may be based on rational speculation unsupported by evidence or empirical data." Id. (quoting FCC v. Beach Commc'ns, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993)). The burden normally rests with the party challenging the law to show that it is "irrational." Id. (citing Warren v. City of Athens, 411 F.3d 697, 710, (6th Cir. 2005)).

The Defendants assert that their collective basis for adopting the policy at issue was to curtail the public's perception of the TDS as an organization influenced by political favoritism. To support this rationale, the Defendants point to the testimony of Walker in which he stated that Governor Bredesen asked him to "fix" the department's reputation. Walker then observed that a generally-applicable policy of not allowing troopers to return to their employment after they had run for office was aimed at achieving this goal. The Plaintiff has presented no evidence that impugns the veracity of Walker's testimony about his motivations. Rather, Sain argues that the policy actually increased,

14

rather than reduced, the "politics" involved in the TDS's employment decisions.[11] In conducting a rational-basis review, however, this Court's task is not to pass judgment on how effectively a policy implemented by a state agency achieves its goals. Instead, it need only ask whether the implementation of the policy was rational. Though this Court might disagree, it is not irrational for someone in the Defendants' positions to conclude that their desired image–i.e. political neutrality–might be detrimentally affected by allowing its employees to shift back and forth between candidacy for elected office and working as patrolmen. As such, it is not unreasonable for the Defendants to have thought that the policy they implemented would deter this practice. The Defendants also may have been attempting to avoid accusations that the TDS was offering a form of job security to certain candidates in order to curry favor with them in the event they were elected. Thus, the Court cannot say that there was no rational basis for the Defendants' decision not to rehire the Plaintiff, which means injunctive relief would be inappropriate. Becton, 48 F. Supp. 2d at 757-58.

---

[11]Sain calls attention to the following portion of Walker's testimony: "And since I've been here we have not hired anybody based on politics, promoted anybody based on politics, or taken disciplinary action based on politics." (D.E. 40, Walker depo., at 16.) The Plaintiff then makes the following argument:
> It is one thing to say "politics is irrelevant to our hiring considerations"; it is quite the opposite to say, "if you are involved in politics, we will not hire you." The former is politics neutral; the latter is active discrimination. Walker has "removed politics" not by being neutral, but by refusing to hire anyone who has ever engaged in political activity.

(D.E. 40, Pl.'s Response, at 17.) With this argument, the Plaintiff seems to be engaging in wordplay with the term "politics" by exploiting its various definitions. Sain uses the word "politics" to connote civic participation. On the other hand, Walker's usage of "politics" clearly had negative connotations and seemed to be more akin to Machiavellian maneuvering. In the above-quoted portion of Walker's testimony, the Court believes that he was trying to explain his attempts to avoid making employment decisions based on political favoritism, such as awarding promotions because of quid pro quo favors instead of merit.

## CONCLUSION

For the reasons articulated herein, the Court **GRANTS** the Defendants' motions for summary judgment.

IT IS SO ORDERED this 22nd day of May, 2009.

                                                                      s/ J. DANIEL BREEN
                                                                      UNITED STATES DISTRICT JUDGE